IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DAWN WESOLOWSKI, | ) | |
| | ) | |
| Plaintiff, | ) | No. 12-cv-03034 |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | Magistrate Judge Arlander Keys |
| Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This case is before the Court on Plaintiff Dawn Wesolowski's motion for summary judgment. She seeks a remand or an outright reversal of the Commissioner's decision to deny her application for Disability Insurance Benefits and Supplemental Security Income. For the reasons explained below, her motion is granted and the case is remanded to the Commissioner for further proceedings.

**BACKGROUND & PROCEDURAL HISTORY**

On April 15, 2009, and April 21, 2009, Plaintiff Dawn Wesolowski applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), respectively. Ms. Wesolowski alleged that she had became disabled as of November 26, 2008, because of a series of health issues including depression, fibromyalgia, bipolar disorder, edema, obesity, high blood pressure, and asthma. Record at 10, 27-42. Ms.

Wesolowski's application was denied initially and denied upon reconsideration. R. 10. Ms. Wesolowski requested a hearing before an administrative law judge ("ALJ"), and the case was assigned to ALJ Kathleen Mucerino, who held the requested hearing on October 15, 2010. *Id*.

At the hearing before the ALJ, Ms. Wesolowski appeared, and was represented by counsel. Ms. Wesolowski was born on August 24, 1966. R. 203. She testified that she was forty-four years of age at the time of the hearing. R. 32. She also testified that she lives with her boyfriend. R. 29.

The ALJ issued an unfavorable decision on December 16, 2010. R. 18. Ms. Wesolowski requested review and the Appeals Council denied this request on February 29, 2012, leaving the ALJ's decision as the final decision of the Commissioner. R. 1. On April 24, 2012, Ms. Wesolowski filed suit in this Court. This Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c). The parties consented to vest jurisdiction in a Magistrate Judge on June 13, 2012 [7]. Ms. Wesolowski filed her motion for motion for summary judgment [20] on November 2, 2012, and the Commissioner filed its response and cross motion for summary judgment [25] on January 14, 2013.

**ALJ HEARING**

With regard to Ms. Wesolowski's work history, at the ALJ hearing and under oath, Ms. Wesolowski testified that her

background was in insurance and medical. R. 28. Ms. Wesolowski was an "auto bodily injure adjuster for ten years," and then went into the medical field. *Id.* At the date of her onset, she worked for Medical Business Office. R. 33. During this time she was hospitalized for high blood pressure and subsequently was fired. *Id.* Ms. Wesolowski testified that she had lost several very short-term jobs due to her depression and fibromyalgia pain. R. 27. Some of her symptoms include trouble walking, sitting, and concentrating. *Id.* Also, because she would miss a substantial amount of work due to her symptoms, she would not make it past the probationary period and, therefore, be terminated. *Id.* In her last job, she attempted to work at Lakeshore OBGYN from April 2010 through July 2010. R. 40. She was terminated in July 2010, because of her absenteeism due to illness, missing a total of twelve days of work in a three-month period. *Id.* Ms. Wesolowski testified that this type of pattern of attendance is the reason that she has had so many short-term jobs. R. 41. At Lakeshore OBGYN, she had difficulty maneuvering around the office and was slow, because she was not able to elevate her legs. R. 43. Also, because of her shortness of breath, she was not able to concentrate because she would have to focus on breathing. R. 44.

Ms. Wesolowski testified that her blood pressure affects her, because she gets a very quick heartbeat. R. 33. She

testified that she has a lot of shortness of breath and feels problems with the circulation in her lower legs and feet. *Id*. In April of 2010, she was diagnosed with trace pitting edema. R. 36. Her legs swell and it is painful to even have someone poke at her legs. R. 37. She testified that she cannot wear socks because it cuts off her circulation and that her legs are too big for them. *Id*. She is 5'6-1/2 and weighs two hundred eighty pounds. *Id*. Ms. Wesolowski testified that her doctors recommended that she elevate her legs and that if she stands on them, they tend to go numb or spasm. *Id*. She cannot sleep well due to the pain and movement in her legs. R. 43. In fact, she is up sometimes for two or three days at a time, and on the fourth or fifth day, she will sleep an entire day or two days in a row. *Id*.

Ms. Wesolowski testified that she can use her hands to write on good days, however, on bad days, the pain in her hands will prevent her from holding the pen correctly and it looks like a child's writing. R. 34. When her fingers are not swollen and sore, she still has a lot of joint pain, and her fingers are swollen and sore for about a two-week period every month. *Id*. She testified that she is not noticing any difference in the pain she is experiencing when she takes the pain medication that was prescribed for her. R. 34. She was prescribed Meloxicam for her arthritis in her back, and that was not providing any

relief. *Id*. She was prescribed Miraplex for her legs, but she testified that it does not help with the swelling. *Id*. She was also taking Citalopram and Xanax for her depression, and was prescribed Lyrica for her fibromyalgia, but she had an allergic reaction to the Lyrica, so she doesn't have any pain medication for it. R. 28. Lastly, she took Hydrochlorothiazide for excess water consumption in the body, which made her urinate once an hour. R. 38. Ms. Wesolowski also testified that her depression was very bad at the moment, and that had it not been for the ALJ hearing, she would not have left her home. R. 39.

With regard to Ms. Wesolowski's daily routine and activities, Ms. Wesolowski testified that lately most of her day has been spent in bed or sitting, reclining and watching television with her feet up due to the pain in her legs, feet, hips, and back. R. 29. Most of the pain was in her legs and feet, and if she does not elevate them, they swell quite a bit, and she is not able to put pressure on them. *Id*. She does housework a little bit at a time and she rests in between for an hour to an hour and fifteen minutes. R. 30. When she is doing laundry, she will sit and use the computer and look for jobs on "CareerBuilder" or "Monster," and apply to things that she feels she is qualified for. R. 31. She and her boyfriend go grocery shopping together, because she cannot bring in the groceries. R. 39.

Ms. Wesolowski testified that her depression causes her to have bad days four out of seven days every week. R. 40. On these bad days, she gets out of bed and moves to the recliner and then back and forth between the recliner and the bed. *Id*. She does not often spend time with friends, because she recently relocated to Illinois from Indiana. R. 29. She does not have a problem getting along with people; however, she testified that she is short tempered, and her temper has become shorter and shorter, because she never really feels very well. *Id*.

Ms. Wesolowski testified that she could not do more than thirty to forty-five minutes at a time of housework. R. 30. When doing laundry, she is able to wash the clothes, however, she is not able to carry the laundry downstairs to the basement, and then when she is finished doing laundry, someone carries it back up the stairs and puts it away. R. 31. Also, she is able to only carry two bags of groceries at a time without becoming short of breath due to her asthma and high blood pressure. *Id*.

**VOCATIONAL EXPERT TESTIMONY**

The ALJ heard testimony from Matthew C. Lampley, a Vocational Expert, who had reviewed Ms. Wesolowski's prior work and vocational background. R. 46. Mr. Lampley was present during Ms. Wesolowski's testimony. *Id*. He testified that Ms. Wesolowski's prior employment had transferrable skills, such as knowing rules and regulations in the medical and insurance

industry, knowledge of medical terminology, performing contract analysis, making judgments as it pertains to the claims, and the ability to apply logic to identify problems within the industry. R. 47. Mr. Lampley determined that a hypothetical individual with limitations similar to Ms. Wesolowski would not be able to perform her past work due to occasional fine and gross manipulation. *Id.* Mr. Lampley also determined that there were other occupations in the national and regional economy that a hypothetical person could perform, such as sales attendant, school bus monitor, or vending machine attendant. *Id.*

However, Mr. Lampley did conclude that work would be precluded for a hypothetical individual who had to elevate his or her feet twenty percent of the time. R. 49. Mr. Lampley also testified that a hypothetical person who has limitations similar to Ms. Wesolowski and who was limited to a sedentary level of work would not be able to perform Ms. Wesolowski's past work. *Id.* However, Mr. Lampley did determine that Ms. Wesolowski could perform jobs such as call-out operator or surveillance systems monitor. *Id.* He also testified that, if Ms. Wesolowski missed one to three days a month due to her impairments, it would preclude all competitive work. *Id.*

**MEDICAL RECORD**

In addition to the testimony of Ms. Wesolowski and the Vocational Expert Mr. Lampley, the record before the ALJ, and

this Court, includes medical records. However, as pointed out during the ALJ hearing, the record does not include the medical records of Ms. Wesolowski that document her first diagnosis of fibromyalgia in 2005. R. 28.  In fact, there is no medical documentation in the record prior to December 27, 2007.  R. 293-295.  On December 27, 2007, Ms. Wesolowski went in for a checkup and indicated symptoms of episodic right abdominal pain.  R. 294.  At the time, Ms. Wesolowski was five feet five inches tall and weighed two hundred and forty three pounds. R. 287. She was treated by Dr. Fariha Kausar. *Id*.  After a pregnancy test confirmed that she was pregnant, she was instructed to stop taking all prescribed medications and to go to the emergency room if abdominal pain or bleeding occurred. R. 295.

On January 23, 2008, Ms. Wesolowski again saw Dr. Kausar, where she weighed two hundred and thirty nine pounds. R. 287. During this visit, Ms. Wesolowski reported a head injury that she had sustained a week prior and complained of face twitching. R. 292.  Ms. Wesolowski also indicated that she was in pain, however, it does not specify where the pain was located or what the causes of it were. *Id*.  Dr. Kausar noted that Ms. Wesolowski had a miscarriage two weeks prior. R. 287, 292.  Dr. Kausar performed a pregnancy evaluation and Ms. Wesolowski tested negative.  R. 286.  Dr. Kausar instructed Ms. Wesolowski to resume her medications and noted that Ms. Wesolowski needed to

go to the emergency room to have a CT Scan and brain evaluation performed. R. 293.

On November 25, 2008, Ms. Wesolowski called Dr. Kausar complaining of weakness, diarrhea, vomiting, shortness of breath, heart beating fast, and not being able to get out of bed for two days. R. 286. Dr. Kausar instructed Ms. Wesolowski to go to the emergency room. *Id.* A few weeks later, on December 30, 2008, Ms. Wesolowski saw Dr. Kausar and weighed two hundred and sixty one pounds. R. 287. Dr. Kausar noted that Ms. Wesolowski was obese, and depressed (indicating that she would refer Ms. Wesolowski to a psychologist). R. 291. Dr. Kausar also noted that Ms. Wesolowski had pain, dyslipidemia, and that there was right arm swelling. R. 290-91. She indicated that Ms. Wesolowski complained of bloating, abdominal discomfort, that her general body pain worsened since taking Statin, and that the swelling under the right arm had increased. R. 290.

On January 13, 2009, Dr. Kausar referred Ms. Wesolowski to the office of Dr. Shabeeb for a breast tissue biopsy. R. 286. Dr. Demir performed the biopsy on January 23, 2009. R. 310. Dr. Demir indicated that at the time, "Ms. Wesolowski is a forty-two year old female who complains of discomfort related to bilateral axillary breast tissue. This has been increasing in size. Mammogram and sonogram were unremarkable for any malignancy." R. 312. Dr. Demir explained the condition to Ms. Wesolowski, and

the risks of surgery to remove the problem tissue and proceeded with the surgery. R. 313. The tests after the surgery indicated that there was no evidence of a tumor. R. 316-317. Following the surgery and a few follow-ups, Ms. Wesolowski cancelled and rescheduled four appointments from February 19, 2009 through April 9, 2009 for various reasons. R. 301. Finally, on April 9 2009, Dr. Demir saw Ms. Wesolowski and indicated that she was doing well. *Id*.

On September 21, 2009, Ms. Wesolowski was seen and treated by Dr. Mary Okam-Ubanwa for a health maintenance exam and prescription refills. R. 409, 411. Ms. Wesolowski weighed two hundred seventy two pounds at the time of the visit. R. 409. There was no edema present in the bilateral lower extremities. R. 410. Dr. Okam-Ubanwa indicated that Ms. Wesolowski had essential hypertension (benign), uncontrolled hypertension, morbid obesity, fatigue/malaise, diarrhea, and back sprain. *Id*. Dr. Okam-Ubanwa ordered several diagnostic laboratory tests to be performed as well, and referred Ms. Wesolowski to a gastroenterologist and gynecologist. R. 410, 411. Ms. Wesolowski had indicated that she had not taken her medication in one month and Dr. Okam-Ubanwa educated Ms. Wesolowski about the dangers and consequences of her non-compliance and behavior. R. 411. Ms. Wesolowski went for testing on September 29, 2009, where she reported frequent urination. R. 407. She also

reported back on November 6, 2009 for her test results, which did not indicate any irregularities. R. 406.

On October 30, 2009, at the request of the Indiana Disability Determination Bureau, Dr. Ikechukwu Emereuwaonu performed a physical examination on Ms. Wesolowski. R. 374-377. Ms. Wesolowski weighed two hundred seventy five pounds. R. 375. Dr. Emereuwaonu indicated that Ms. Wesolowski had no limitations getting on and off the exam table, tandem walking, walking on toes, walking on heels, squatting, or hopping. R. 377. In regards to Ms. Wesolowski's lower extremities, there was no swelling, stiffness, effusion, or skin discoloration present. *Id*. However, Ms. Wesolowski did have blood pressure of 148 over 93. R. 375. Dr. Emereuwaonu indicated that Ms. Wesolowski had fibromyalgia and depression with hypertension. R. 377.

A few days later, on November 12, 2009, Dr. Okam-Ubanwa again treated Ms. Wesolowski. R. 403. She was there for a preventative physical examination and complained of cold symptoms, i.e. cough, wheezing, nasal congestion, etc. *Id*. She complained of having a hard time swallowing, and a lot of pressure in both ears, and indicated that she still felt tired and depressed. *Id*. She weighed two hundred seventy three pounds. *Id*. There was no edema present in the bilateral lower extremities. R. 404. However, Dr. Okam-Ubanwa indicated that Ms. Wesolowski had hypertension (benign), depression, morbid

obesity, acute bronchitis, and chronic pelvic pain. *Id.* Dr. Okam-Ubanwa also referred Ms. Wesolowski to psychiatry for a depression evaluation and to Dr. Marsh for a follow-up on the pelvic pain. R. 405.

On February 25, 2010, Ms. Wesolowski saw Dr. Okam-Ubanwa and on April 30, 2010, Ms. Wesolowski saw Dr. Ricardo C. Hood. R. 400, 402. During both visits, Ms. Wesolowski indicated the same symptoms and the treatment from both doctors were virtually the same. *Id.* Ms. Wesolowski weighed two hundred seventy seven pounds during her April 30, 2010 appointment. R. 398. There was no edema present in the bilateral lower extremities. R. 399, 402. She indicated she was there for several reasons including preventative examination, swelling in both legs, MRI and EKG report, anxiety evaluation, sinus congestion, and wheezing. During the visit, Dr. Hood discontinued the Loratadine and Citalopram medications. R. 396. Dr. Hood indicated mood and affect normal and appropriate to the situation. R. 400. Dr. Hood indicated that Ms. Wesolowski had essential hypertension (benign), depression, morbid obesity, acute bronchitis, restless leg syndrome, and mixed hyperlipidemia. *Id.* Dr. Hood also indicated that he discussed with Ms. Wesolowski the need for weight and dietary controls and informed her family about the risks of obesity, and that the family must be involved to promote a healthy lifestyle. *Id.*

On May 25, 2010, Ms. Wesolowski saw Dr. Hood for a number of issues. R. 396. She went in for a checkup, vomiting, diarrhea, chills, light-headedness, asthma, and to refill her medications. *Id*. Ms. Wesolowski weighed two hundred seventy pounds. *Id*. Dr. Hood noted that Ms. Wesolowski was pleasant, in no apparent distress, and looks her given age, is well developed and nourished with good attention to hygiene and body habits. *Id*. Dr. Hood indicated that Ms. Wesolowski had asthma, and acute bronchitis. R. 397. Dr. Hood scheduled a follow-up visit for three months. *Id*.

On July 20, 2010 and August 2, 2010, Ms. Wesolowski went to the Ingalls Tinley Park Primary emergency room. R. 455, 465. Ms. Wesolowski complained both times of abdominal pain. *Id*. On July 20, 2010, she was diagnosed with ovarian cyst, sinusitis, and anemia and was told to follow up with her primary care physician as soon as possible for the anemia. R. 478. On August 2, 2010, it was determined that Ms. Wesolowski also had uterine fibroids and was again instructed to follow up with her primary care physician. R. 462.

In regard to Ms. Wesolowski's bipolar disorder, on December 9, 2009, Ms. Wesolowski followed Dr. Hood's referral and reported to the Regional Mental Health Center and underwent her mental evaluation. R. 435, 436, 439. She was diagnosed with bipolar disorder and given a treatment plan with objectives

13

and individual psychotherapy. R. 436. It was indicated that Ms. Wesolowski qualified for supportive community services; however, she was only interested in individual psychotherapy and the psychiatric assessment at that time. R. 449.  Ms. Wesolowski reported to three treatment sessions total, dating December 22, 2009, December 29, 2009, and January 14, 2010, led by Mr. Bernardo Flores. R. 426, 429, 433.  On January 25, 2010, Ms. Wesolowski reported to another assessment given by Dr. Sonia Yballe at the Regional Mental Health Center. R. 422.  During this time period from December, 2009 through January, 2010, Ms. Wesolowski cancelled for several reasons including weather, car trouble, and one reason that she had found a job, so she was not able to make it.  R. 420, 425, 428.  Ms. Wesolowski was eventually discharged, because she had cancelled her last appointment and she did not respond to attempts to engage.  R. 417. It was also noted that Ms. Wesolowski did not demonstrate a significant amount of change in the short amount of time that she participated. R. 418.

On July 9, 2009, five months before Ms. Wesolowski's mental evaluation, Dr. Joelle Larsen completed a Psychiatric Review Technique regarding Ms. Wesolowski. R. 359. Dr. Larsen determined that there was insufficient evidence to determine Ms. Wesolowski's functional limitations. R. 369.  Dr. Larsen noted that the "Claimant alleged 'fibromyalgia, depression, HBP,

possible rheumatoid arthritis.' No history of treatment for depression. MSE was ordered. Claimant reported she obtained a job and did not want to pursue disability claim. MSE needed to fully evaluate. Insufficient evidence in file." R. 371. Dr. Mangala Hasanadka then signed off on the report. R. 373.

Dr. Kenneth Neville completed a follow-up Psychiatric Review Technique on November 4, 2009, one month prior to Ms. Wesolowski's mental evaluation. R. 380. Dr. Neville indicated under "Medical Dispositions" that Ms. Wesolowski's impairments were "Not Severe" and that the category upon which the medical disposition was based included "Affective Disorders." *Id.* Dr. Neville also indicated that his findings completed the medical portion of the disability determination and that a medically determinable impairment was present that did not satisfy the diagnostic criteria outlined in the Psychiatric Review Technique. R. 380, 383. Dr. Neville indicated that the restriction of activities of daily living, difficulties in maintaining social functioning, concentration, persistence, or pace, were all mild. R. 390. He also indicated that episodes of decomposition, each of extended duration did not exist. *Id.* Dr. Neville noted that the "claimant's allegation are partially credible, as she tends to emphasize symptoms and limitations and minimize abilities. Severity is not fully supported by medical

expertise." R. 392. Dr. J.V. Corcoran then signed off on the report. R. 394.

Following the Psychiatric Review Technique, at the request of the Indiana Disability Determination Bureau, on October 26, 2009, Dr. Irena M. Walters performed a Mental Status Evaluation on Ms. Wesolowski. R. 283. Dr. Walters indicated that Ms. Wesolowski was alert and oriented to person, place and time. R. 284. During the interview, Ms. Wesolowski tearfully stated that she had fleeting thoughts of self harm since August of 2009, because she was not feeling good and she also felt like she was a burden and not independent. *Id.* Dr. Walters summarized the encounter stating that Ms. Wesolowski was cooperative putting forth good effort during this evaluation. R. 285. Dr. Walters also diagnosed Ms. Wesolowski with depressive disorder, bipolar disorder, fibromyalgia with obesity, and high blood pressure. *Id.*

On May 21, 2009, Ms. Wesolowski completed a "Function Report." R. 216-23. In the Report, she indicated that her daily activities consisted of some days having the energy to head to the library to look for work, light food shopping and errands, and on bad days, she slept on and off all day and she was unable to accomplish basic tasks. *Id.* She was not able to hold a full time job for longer than a few weeks or months due to her illness. R. 217. She prepares her own meals such as sandwiches,

frozen dinners, and occasionally a three-course dinner consisting of meat, starch, and vegetables. R. 218. Each meal takes about twenty to thirty minutes and due to her illness she cooks less complicated food. *Id.* She indicated that she is able to do laundry and light housecleaning and that laundry takes the longest about three to four hours and a half day to clean the house. *Id.* Doing these chores makes Ms. Wesolowski very short of breath, so she is not able to do these tasks regularly. *Id.* She goes outside once or twice a week, and she is able to drive, ride in a car, and walk. R. 219. She indicated that she goes shopping for basic items, clothing, and food once every two weeks for two to three hours at a time. *Id.*

Ms. Wesolowski indicated that she is able to pay her bills, count change, handle a savings account, and use a checkbook. *Id.* She likes watching television, reading, and working out. R. 220. However, she indicated that she is no longer able to workout, because she cannot breathe well and that she tires easily. *Id.* She indicated that she likes to talk on the phone, go out with her boyfriend, see family, and that she does these things once a week and sometimes twice a week. *Id.* Ms. Wesolowski also indicated that when she is depressed and having a "flair," she feels that no one understands why she is tired and crabby and why she cannot do things. R. 221. She also indicated that she has a hard time walking far and playing with

her niece and nephew. *Id.* On the list of items that illnesses, injury, or conditions affect, Ms. Wesolowski checked twelve out of nineteen boxes: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, concentration, and getting along with others. *Id.* She indicated that pain and fatigue plays a major role in how she feels day-to-day and that each day is different. *Id.* She also indicated that she can walk about a block to a block and one half, and that she would need to rest for several minutes before resuming her walk. *Id.* Ms. Wesolowski also indicated that stress causes flairs in her illness and severely increases her depression. R. 222.

Ms. Wesolowski completed another function report, four and one half months after her last, on October 5, 2009. R. 243-50. The report was mostly the same, however, Ms. Wesolowski showed pain and symptom progression in her responses. *Id.* She indicated that it now takes her two and one half to three hours to get moving due to severe hip, back, and leg pain. *Id.* She indicated that she showers sometimes. *Id.* Ms. Wesolowski also checked thirteen of the nineteen boxes on the list of items that illnesses, injury, or conditions affect, adding memory to the list. R. 248. She also stated that she gets tired after walking several feet as opposed to one block, and that it takes her ten to fifteen minutes of rest to be able to continue. *Id.* Ms.

Wesolowski also indicated that she now does not handle stress well, because it makes her teary quickly or become physically ill. R. 249.

**WORK HISTORY**

In regard to Ms. Wesolowski's work history, from 2001-2007, Ms. Wesolowski worked as an account manager in a collections department and from 1990 – 2001, she worked as an insurance adjustor in the insurance field. R. 209.  On May 13, 2009, Ms. Wesolowski completed a Work Activity Report. R. 199.  She indicated that on June 10, 2008, she worked one day for Staff Source. R. 193. She indicated that she worked at Family Care Center from July 10-15, 2008. R. 192.  She then worked from October 10 – November 26, 2008 at Orthopedic Specialists. *Id*. She indicated that she stopped working, because she was off of work for two weeks, because of pneumonia and was subsequently let go. *Id*.

**ALJ's DECISION**

The ALJ issued her decision on December 16, 2010, denying Ms. Wesolowski's claims for DIB and SSI. R. 7.  The ALJ determined that Ms. Wesolowski met the insured status requirements of the Social Security Act through December 31, 2013, and that Ms. Wesolowski had not engaged in substantial gainful activity since November 26, 2008.  R. 12.  The ALJ determined that Ms. Wesolowski had the following impairments,

which are severe in combination: fibromyalgia with chronic pain, osteoarthritis, morbid obesity, hypertension, restless leg syndrome, edema, and asthma. *Id*. The ALJ determined that all of these impairments in combination more than minimally interfere with Ms. Wesolowski's ability to perform work related activity. *Id*. However, the ALJ determined that Ms. Wesolowski's impairment related limitations do not preclude all work activity. R. 15.

The ALJ also stated that "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity report." R. 15. The ALJ also noted that a consultative examination of Ms. Wesolowski showed no muscle atrophy, calling into question the truthfulness or reliability of her claims about laying down all day. *Id*. The ALJ also relied on the testimony of the Vocational Expert, Mr. Langley, and determined that, given Ms. Wesolowski's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that are considered sedentary, such as call operator and surveillance systems monitors that Ms. Wesolowski could attain and perform. R. 17. Therefore, the ALJ determined that Ms.

Wesolowski was not disabled within the meaning of the Social Security Act and was not entitled to benefits. R. 17, 18.

After the Appeals Council denied review, Ms. Wesolowski filed a lawsuit in this Court, seeking review of the Social Security Administrations' final agency decision. The parties consented to proceed before this Court, and the case was reassigned on June 25, 2012. The case is now before the Court on the parties' motions for summary judgment. Ms. Wesolowski asks the Court to reverse the Commissioner's decision denying her benefits, or to remand the matter for further proceedings. Defendant responds, requesting that the Court grant summary judgment in its favor.

**DISCUSSION**

**APPLICABLE LAW**

An individual claiming a need for DBI or SSI must prove that she has a disability under the terms of the SSA. In determining whether an individual is eligible for benefits, the social security regulations require a sequential five-step analysis. First, the ALJ must determine if the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404,

Subpart P, Appendix 1; fourth, the ALJ must determine the claimant's RFC, and must evaluate whether the claimant can perform her past relevant work; and fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir.1995). At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the Commissioner. *Id.*

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir.2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir.2007) (*citing Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir.2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir.1990).

An ALJ must articulate his or her analysis by building an accurate and logical bridge from the evidence to her conclusions, so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Steele*, 290 F.3d at 941. It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is not sufficiently articulated, so as to prevent meaningful review, the Court must remand. *Id.*

**ANALYSIS OF MS. WESOLOWSKI'S ARGUMENTS**

Ms. Wesolowski argues that the ALJ's decision should be reversed or remanded, because the ALJ erred in three main ways. First, Ms. Wesolowski argues that the ALJ erred by overlooking and not specifically addressing the medical evidence of her mental impairments such as Depression, Bipolar Disorder, Anhedonia, and mood swings in the opinion. Pl. Mot. S.J. at pp. 7-8. Second, Ms. Wesolowski argues that the ALJ erred in assessing her RFC to perform sedentary work. *Id.* at 10. Specifically, Ms. Wesolowski argues that the ALJ excluded mental limitations in the hypothetical questions to the vocational expert, failed to adequately analyze her obesity, and failed to consider Ms. Wesolowski's alleged sitting limitations. *Id.* at

10-11.  Third, Ms. Wesolowski asserts that the ALJ erred in evaluating her credibility.


**THE ALJ'S REVIEW OF MENTAL IMPAIRMENTS**

Ms. Wesolowski argues that the ALJ erred by overlooking, and not specifically addressing the medical evidence of Plaintiff's mental impairments, such as Depression, Bipolar Disorder, Anhedonia, and mood swings in her opinion. Pl. Mot. S.J. at pp. 7-8.  In particular, Ms. Wesolowski argues that the ALJ failed to mention Ms. Wesolowski's diagnosis and treatment at Regional Mental Health Center for her mental impairments. *Id*. Ms. Wesolowski also argues that the ALJ failed to mention testimony and self-reports, which suggested severe depression, and instead, solely discussed Ms. Wesolowski's daily activities.

In response, the Commissioner argues that the ALJ did not overlook Ms. Wesolowski's mental impairments. Def. Resp. at p. 5.  The Commissioner argues that the ALJ's "findings of Ms. Wesolowski's mental functioning was supported by no less than three physicians." *Id*.  Also, the Commissioner argues that the ALJ stated that she considered the entire record and furthermore, the Commissioner argues that the ALJ did refer to the discharge summary from Ms. Wesolowski's treatment with Dr. Yballe, a psychiatrist, which, indicated that Ms. Wesolowski had only attended three sessions before dropping out. *Id*. at 5-6.

The ALJ is not required to address every piece of evidence or testimony presented, but must provide a "logical bridge" between the evidence and his conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009)(*citing Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir.2000)).

In the ALJ's opinion, the ALJ stated that she carefully considered the entire record, however, the ALJ did not specifically mention Ms. Wesolowski's medical treatment with Dr. Yballe at the Regional Mental Health regarding her mental impairments or any of the other doctors who considered Ms. Wesolowski's mental impairments. R. 12.  Instead, in determining Ms. Wesolowski's mental impairments, the ALJ noted Ms. Wesolowski's testimony and self-reported RFC reports that indicated that Ms. Wesolowski is short tempered, but is able to get along with others, does her own finances, prepares her own meals, and stated that she believes she is able to work, and was therefore, constantly looking for work. R. 13.  The ALJ further explained that, "the findings regarding Ms. Wesolowski's functional limitations are further supported by the state agency consultant's assessments, which are given great weight to the extent they are consistent with the evidence of record as a whole." *Id*.  The ALJ then concluded that Ms. Wesolowski only had mild limitations in the areas of daily living, social functioning, concentration, persistence or pace and no episodes

of decompensation, therefore, Ms. Wesolowski's mental
impairments were not severe. *Id*.

Although, the ALJ did mention Ms. Wesolowski's testimony
and self-reported RFC, as well as the state agency consultant's
assessments in evaluating Ms. Wesolowski's mental impairments,
the ALJ did not mention in the opinion the objective medical
evidence of Ms. Wesolowski being treated by Dr. Yballe at the
Regional Mental Health Center.  The ALJ may have considered the
medical evidence in question, however, because it was not
addressed in the opinion, and because the ALJ must articulate
her analysis by building an accurate and logical bridge from the
evidence to her conclusions, the Court finds that the case
should be remanded on this issue, and the medical evidence of
Ms. Wesolowski being treated by Dr. Yballe should be addressed
by the ALJ.


**THE ALJ'S RFC DETERMINATION**

Next, Ms. Wesolowski argues that the ALJ erred in assessing
her RFC Report in three ways.  First, Ms. Wesolowski argues that
the ALJ did not incorporate her mental impairments in the
hypotheticals to the vocational expert. Second, Ms. Wesolowski
argues that the ALJ did not adequately consider her obesity in
her RFC Assessment.  Third, Ms. Wesolowski argues that the ALJ
lacked a reasonable basis for finding that Ms. Wesolowski could

perform the sitting requirements of sedentary work.  When determining a claimant's RFC, the ALJ must consider the combination of all limitations on the ability to work, including those that do not individually rise to the level of a severe impairment. *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010) *(citing* 20 C.F.R. § 404.1523; *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir.2009); *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir.2009)).  A failure to fully consider the impact of non-severe impairments requires reversal. *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir.2003).

Ms. Wesolowski argues that the ALJ was required to include her mental impairments in the hypotheticals to the VE. Specifically, Ms. Wesolowski argues that the ALJ must "specifically include mild limitations in concentration, persistence, or pace and social functioning in hypothetical questions to the vocational expert." Pl. Mot. S.J. at p. 11. Ms. Wesolowski further argues that even mild limitations in social functioning could preclude her from doing the jobs the ALJ found that Ms. Wesolowski was capable of doing. *Id*.

The Commissioner admits that the ALJ did not include mental impairments in the hypothetical questions to the vocational expert, but argues there is no error.  The commissioner argues that the case *Koswenda v. Astrue*, 2009 WL 958542, (N.D. Ill. 2009) cited by Ms. Wesolowski to support her argument that the

ALJ is required to include mental impairments in the hypotheticals to the vocational expert is unpublished, and therefore, lacks precedential value.

During the ALJ hearing, the ALJ did not include hypotheticals to the VE regarding Ms. Wesolowski's mental impairments. R. 45-50. Although, *Koswenda* is an unpublished case, the Court finds that it has value. Furthermore, although the ALJ concluded that Ms. Wesolowski's mental impairments were mild, the ALJ is required to consider the combination of all limitations on the ability to work, and the ALJ should have posed questions to the VE that included mild mental impairment to assess whether it would have precluded Ms. Wesolowski from performing sedentary work. Therefore, on remand, the ALJ is to include Ms. Wesolowski's mental impairments in a hypothetical to the VE.

Next, in regards to the ALJ adequately assessing Ms. Wesolowski's obesity, Ms. Wesolowski argues that the ALJ erred. Ms. Wesolowski argues that the ALJ failed to specifically address how obesity can have an effect on her joint pain due to her fibromyalgia. Pl. Mot. S.J. at p. 12. The Commissioner argues that the Seventh Circuit has "repeatedly characterized an ALJ's failure to explicitly discuss a claimant's obesity as harmless error when the ALJ factors obesity 'indirectly' into her decision." Def. Resp. at p. 7; *Richards v. Astrue*, 320 F.

App'x 727, 733 (7th Cir. 2010).  The Commissioner further argues that, in the opinion, the ALJ directly referenced Ms. Wesolowski's obesity and that this was sufficient.  *Id*. at p. 8.

In her opinion, the ALJ directly referenced that Ms. Wesolowski was morbidly obese, weighing 280 pounds, standing at five feet six inches. R. 12.  In addition, the ALJ stated that "when obesity is identified as medically determinable impairment, consideration would be given to any functional limitations resulting from the obesity in the residual functional capacity assessment in addition to any limitations resulting from any other physical or mental impairment identified." *Id.* at 13.  The ALJ went on to state that, in Ms. Wesolowski's case, obesity in combination with her other impairments, is a severe impairment as it results in significant limitation of the claimant's ability to perform work-related activity. *Id*.  The Court finds that the ALJ did reference Ms. Wesolowski's obesity, and the ALJ's statement that Ms. Wesolowski's obesity is a significant limitation that has an effect on her other impairments is sufficient to adequately assess the impact Ms. Wesolowski's obesity has on her impairments.

Third, Ms. Wesolowski argues that the ALJ lacked a reasonable basis for finding that she could perform the sitting requirements of sedentary work.  In particular, Ms. Wesolowski

argues that the ALJ rejected the opinion of the State Agency doctor who found insufficient evidence of a physical impairment, and instead incorrectly uses her own lay medical opinion to determine whether Ms. Wesolowski can sit for six to eight hours at a time.  In addition, Ms. Wesolowski argues that she testified that she lost several jobs, because she has trouble sitting and in her self-reported RFC, she stated that she could not stand or sit in the same position for more than 10-15 minutes. Pl. Mot. S.J. at p. 13.

The Commissioner argues that, although the ALJ rejected the State Agency doctor's finding of insufficient evidence of physical impairment, there is not an "evidentiary deficit" between the two findings, because the doctor found that there was no severe physical impairment.  Def. Resp. at p. 8.  The Commissioner then argues that, during the physical consultative examination, Dr. Emereuwaonu did not articulate that Ms. Wesolowski had any sitting limitations and that this further strengthens the ALJ's finding. *Id*.

In the opinion, the ALJ did not specifically address the sitting requirements for performing sedentary work, nor did the ALJ address sitting requirements to the VE during the ALJ hearing.  On remand, the ALJ is to address these issues.

**THE ALJ'S CREDIBILITY DETERMINATION**

Next, Ms. Wesolowski asserts that the ALJ erred in evaluating her credibility in six ways. First, Ms. Wesolowski argues the ALJ's use of the boilerplate language: "medically determinable impairments could reasonably be expected to cause the alleged symptoms," and "statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they are inconsistent with the above residual functional capacity assessment," is frowned upon by the Seventh Circuit. Pl. Mot. S.J. at p. 14. Ms. Wesolowski argues that the use of boilerplate language is not only frowned upon by the Seventh Circuit, but that the language itself gets things backwards, because it "implies that the ability to work is determined first and is then used to determine the claimant's credibility." *Id.* Ms. Wesolowski further calls into question the ALJ's entire evaluation of her credibility. *Id.*

In response, the Commissioner argues that, although the ALJ used boilerplate language, and although the Seventh Circuit "criticized the sentence or one like it as 'opaque,' 'meaningless,' and 'unsustainable'," it is not automatic grounds for reversal. Def. Resp. at p. 9. The Commissioner argues that it is not the mere use of boilerplate language that is criticized by the Seventh Circuit, but rather it is the use of such language without further explanation. *Id.*

Here, in the opinion, the ALJ did use boilerplate language discounting the severity and intensity of the Ms. Wesolowski's alleged symptoms. R. 15. However, in the immediate following paragraph and the rest of the opinion, the ALJ expanded her finding with further detail about the severity of Ms. Wesolowski's alleged symptoms, specifically, her need to lie down during most of the day, the use of her hands, her joint pain, swelling, and shortness of breath. R. 15-16. Therefore, although the ALJ used boilerplate language in one paragraph of the opinion, the ALJ does give further explanation regarding the boilerplate language used, and therefore, did not err in the use of such language satisfying the requirements set forth by the Seventh Circuit. See *Richison v. Astrue*, 462 F. App'x 622, 625 (7th Cir. 2012).

Second, Ms. Wesolowski argues that the ALJ erred by discounting Ms. Wesolowski's credibility regarding her need to lie down on some days. Pl. Mot. S.J. at p. 15. Ms. Wesolowski argues that the ALJ's decision lacks merit, because her testimony at the ALJ hearing that she "does little but lay down all day," should be credible. *Id.* The ALJ discredited her on that basis that her muscles were not atrophied. However, Ms. Wesolowski argues that the ALJ did not explain how normal muscle tone with no atrophy would impact an individual's need to lie down during the day. *Id.* The Commissioner argues that Ms.

Wesolowski was mistaken as to what the ALJ meant by discrediting Ms. Wesolowski's claim that "she does little but lay down all day." Def. Resp. at. p. 10.  The Commissioner argues that, because Ms. Wesolowski had normal muscle atrophy, the ALJ discredited the statement that she lies down all day, because people that lie down all day "would not be likely to have normal muscle tone atrophy or wasting." *Id.*

Here, in the opinion, the ALJ stated that "although the medical evidence of record shows that Ms. Wesolowski has impairments, which more than minimally interfere with her ability to work, it does not entirely support the credibility of the claimant's allegations regarding her complete inability to work." R. 15.  The ALJ then goes on to detail that a consultative examination was given to Ms. Wesolowski that showed that she had normal muscle atrophy, which, would discredit Ms. Wesolowski's testimony that she gave during the hearing that she does "little but lay down all day." *Id.*  However, there seems to be some confusion about Ms. Wesolowski's daily activities.  In particular, Ms. Wesolowski testified that on bad days, when she is depressed and or having severe pain, "she gets out of bed and moves to the recliner and that she is back and forth between the recliner and the bed." R. 40.  While the statement that she does "little but lay down all day" would certainly cause pause for concern, this statement is either mistaken or taken out of

context. Ms. Wesolowski indicated on several self-reported RFC assessments and during actual testimony what her daily activities included, including laundry, grocery cleaning, house work and making meals. R. 40, 216-23, 243-50. As this case is being remanded on other issues, the ALJ on remand is directed to carefully analyze her credibility findings, including any finding regarding Ms. Wesolowski's daily activities.

Third, Ms. Wesolowski argues that the ALJ erred in discounting Ms. Wesolowski's alleged difficulty of using her hands. Pl. Mot. S.J. at p. 15. An ALJ "may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it. *Lang v. Astrue*, 2012 WL 6106646 (N.D. Ill. 2012) *(citing Villano v. Astrue*, 55 F.3d 558, 562 (7th Cir. 2009); SSR 96-7: 20 C.F.R. § 404.1529(c)(2); *Johnson v. Barnhart*, 449 F.3d 863, 871-72 (7th Cir. 2000)). Regarding her hands, Ms. Wesolowski argues that, in the opinion, the ALJ limited her to only occasional gross and fine finger manipulation in her RFC assessment, and thus, must have found her partially credible. Pl. Mot. S.J. at pp. 15-16. Ms. Wesolowski then goes on to argue that, on the day of her consultative examination, it was a day where her fingers were not swollen, and that she still experiences two weeks out of a month when her fingers are swollen and sore. *Id*. at 16. Therefore, even though she was having a good day and displayed

normal grip strength and fine finger manipulation during the examination, it does not mean that she does not experience bad days where the outcome would be the opposite. *Id.* The Commissioner argues that the ALJ found that Ms. Wesolowski had some limitations in her hands, however, the ALJ did not find it credible that Ms. Wesolowski experienced a two-week period every month where she was unable to hold objects or write. Def. Resp. at p. 11. As the case is being remanded, the issue of Ms. Wesolowski's limitations of the use of her hands should be addressed on remand.

Fourth, Ms. Wesolowski argues that the ALJ erred in discounting her allegations of joint pain, joint swelling, and shortness of breath. Pl. Mot. S.J. at p. 17. Ms. Wesolowski argues that the ALJ cannot discredit her allegations of joint pain, joint swelling, and shortness of breath, because her doctors did not recommend an aggressive form of treatment or because she did not lose weight. *Id.* Fifth, Ms. Wesolowski argues that the ALJ may not equate her ability to perform daily activities with the ability to do full time work. Pl. Mot. S.J. at p. 18; *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). Ms. Wesolowski argues that, just because she is able to perform the daily activities of laundry, cooking, light housecleaning, driving, shopping, handling of financial matters, talking on the phone, and being social with friends and family in her circle,

does not mean that she is able to perform full time work. *Id.*
Finally, Ms. Wesolowski argues that her continuing to look for
work after her alleged onset does not mean she believed she
could perform the work, therefore, the ALJ erred in not finding
her allegations credible. Pl. Mot. S.J. at 18.  Ms. Wesolowski
argues that it is true that she continued to look for work,
however, that does not mean she believed she could perform the
work. *Id*. at 18-19.  She argues that this is proven by her
testimony and evidenced by her work history of not being able to
sustain work because of absences due to her depression,
fibromyalgia pain, fatigue, and other medical impairments, as
well as by her being fired from her last job. *Id*.  As the case
is being remanded, the ALJ on remand should keep in mind all of
Ms. Wesolowski's arguments when determining her credibility.

**CONCLUSION**

For the reasons set forth above, the Court finds that the
ALJ erred for several reasons.  Upon remand the ALJ must
articulate his or her analysis of Ms. Wesolowski's mental
impairments by building an accurate and logical bridge from the
evidence to her conclusions.  The ALJ will need to revisit the
RFC determination based upon any new credibility findings,
including subjective complaints of tiredness and pain.
Therefore, remand is appropriate.  The Court grants Ms.

Wesolowski's motion for summary judgment and denies the Commissioner's motion for summary judgment. The case is remanded to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.

Date: January 3, 2014

E N T E R E D:

_____
MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT